UNITED STATES of America, and Robert H. Cluberton, Internal Revenue Agent, Internal Revenue Service, Petitioners-Appellees,

v.

CHURCH OF SCIENTOLOGY OF CALIFORNIA and Henning Heldt, Vice President, Respondents-Appellants.

No. 74–1487.

United States Court of Appeals, Ninth Circuit.

June 26, 1975.

James Q. Fisher (argued), Encino, Cal., for respondents-appellants.

Alfred S. Lombardi, Atty. (argued), Tax Div., U. S. Dept. of Justice, Washington, D. C., for petitioners-appellees.

OPINION

Before DUNIWAY and ELY, Circuit Judges, and JAMESON,* District Judge.

DUNIWAY, Circuit Judge:

The Church of Scientology of California appeals from the district court's order enforcing a summons issued by an Internal Revenue Service agent under § 7602 of the Internal Revenue Code of 1954, 26 U.S.C. § 7602, and denying the Church's request for pre-enforcement discovery. We reverse and remand for further proceedings.

I. *Facts.*

On February 8, 1973, agent Cluberton of the Service's Audit Division issued a summons to Henning Heldt, then vice president of the Church of Scientology of California, requiring Heldt to appear on February 20, 1973, to testify and to produce for examination certain records of the Church bearing on its federal income tax liability for 1968 and 1969. Heldt appeared at the appointed time, apparently willing to testify, but without the required records. Heldt said that he was no longer an officer of the Church and that he had neither control nor possession of the records because he had resigned as director and vice president of the Church four days earlier, on February 16, 1973. The agent noted Heldt's appearance but did not examine him. In the course of two years of negotiations preceding the issuance of the summons, Heldt had consistently held himself out to the agent as the representative of the Church in charge of its books and records, and never stated that he was contemplating resigning.

On September 5, 1973, the Service petitioned the district court to enforce the summons against Heldt and the Church under 26 U.S.C. §§ 7402(b) and 7604(a), both of which somewhat redundantly gave the district courts jurisdiction "by appropriate process" to compel compliance with such summonses. The district court issued an order requiring Heldt and the Church to show cause why they should not be required to comply with the summons.

Heldt and the Church then filed a notice of taking depositions of agent Cluberton and two other Service officials and a demand for the production of Service files relating to the Church. The Service moved to quash this discovery. Then Heldt and the Church responded to the order to show cause by alleging, *inter alia*, that the Service had issued the summons for the bad faith purpose of harassing the Church. More specifically, the Church asserted that the instant

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

summons was part of a concerted nation-wide Service strategy to harass various churches of Scientology, which are in the Church's words "doctrinal cousins" but separate entities. According to the Church, the Service has followed a pattern of initiating investigations and administrative and judicial proceedings, but nonetheless resisting definitive determination of the tax exempt status of those churches—all, the Church alleges, for the purpose of applying pressure to the churches to settle the issue of their claimed tax exemptions and of eliminating Scientology organizations. The Church sought to take the depositions of Service officials to attempt to uncover evidence to support these allegations.

The district judge held a hearing on the order to show cause and on the Service's motion to quash discovery, listening to oral argument by counsel, but without the presentation of testimony or other evidence other than affidavits already on file. Concluding that the "allegation of harassment is not supported by the record," the judge entered orders (1) quashing the notice of taking of depositions and (2) enforcing the summons against the Church. At the request of the Church, the judge stayed enforcement of the summons pending appeal, on the condition that the Church deposit with the court all of the books and records sought by the summons. The Church did so, filling 23 trunks with records, and brought this appeal.

■ We have jurisdiction under 28 U.S.C. § 1291. *Reisman v. Caplin,* 1964, 375 U.S. 440, 449, 84 S.Ct. 508, 11 L.Ed.2d 459; *D. I. Operating Co. v. United States,* 9 Cir., 1963, 321 F.2d 586.

II. *Summons Enforcement Proceedings in General.*

We begin with a review of a few basic, settled principles.

■ An internal revenue summons is "administratively issued but its enforcement is only by federal court authority in 'an adversary proceeding' affording the opportunity for challenge and 'complete protection to the

witness.'" *Donaldson v. United States,* 1971, 400 U.S. 517, 525, 91 S.Ct. 534, 539, 27 L.Ed.2d 580; *Reisman v. Caplin,* 1964, 375 U.S. 440, 446, 84 S.Ct. 508, 11 L.Ed.2d 459. The Federal Rules of Civil Procedure apply to a summons proceeding. Fed.R.Civ.P. 81(a)(3); *United States v. Powell,* 1964, 379 U.S. 48, 58, n. 18, 85 S.Ct. 248, 13 L.Ed.2d 112; *Martin v. Chandis Securities Co.,* 9 Cir., 1942, 128 F.2d 731, 734. But the Civil Rules are not inflexible; a district court may limit their application in a proceeding to enforce a summons which is intended to be a summary proceeding, so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available. *Donaldson, supra,* 400 U.S. at 528–29, 91 S.Ct. 534.

■ The Internal Revenue Service need not meet any standard of probable cause to obtain enforcement of its summons; it must show only (1) that the investigation will be conducted pursuant to a legitimate purpose; (2) that the inquiry may be relevant to the purpose; (3) that the information sought is not already within the Service's possession; and (4) that the administrative steps required by the Internal Revenue Code have been followed. *United States v. Powell, supra,* 379 U.S. at 57–58, 85 S.Ct. 248.

However, as the Court explained in *Powell,* 379 U.S. at 58, 85 S.Ct. at 255 (footnotes omitted):

This does not make meaningless the adversary hearing to which the taxpayer is entitled before enforcement is ordered. At the hearing he "may challenge the summons on any appropriate ground," *Reisman v. Caplin,* 375 U.S. 440, at 449, 84 S.Ct. [508], at 513 [11 L.Ed.2d 459]. Nor does our reading of the statutes mean that under no circumstances may the court inquire into the underlying reasons for the examination. It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an im-

proper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the taxpayer, and it is not met by a mere showing, as was made in this case, that the statute of limitations for ordinary deficiencies has run or that the records in question have already been once examined.

These principles were reaffirmed by the Court in *Donaldson v. United States,* 1971, 400 U.S. 517, 526–27, 91 S.Ct. 534, 27 L.Ed.2d 580, and more recently in *United States v. Bisceglia,* 1975, 420 U.S. 141, 146, 95 S.Ct. 915, 43 L.Ed.2d 88.

### III. *The Alleged Abuse of Process.*

The four criteria for enforcement set out in *Powell* were satisfied in this case. The principal question on appeal is whether the district court erred in enforcing the summons without allowing discovery and without taking evidence on the alleged abuse of the court's process. We conclude that the court should have held a limited pre-enforcement evidentiary hearing.

### A. *The Allegation of Bad Faith IRS Harassment.*

We first consider the Church's allegations and the support for them that appears in the record.

Attached to the Church's memorandum in opposition to enforcement of the summons is a "Summary of Administrative and Judicial Proceedings involving the Church of Scientology and its Parishioners," which the Church says reveals a pattern of bad faith IRS harassment. This summary lists eleven proceedings involving various churches of Scientology. With respect to the California Church, the summary states that the Service retroactively revoked the tax exempt status of the California Church in 1968 and that questions of the Church's tax liability for 1964 through 1967 were pending at the appellate conference level when the summons was issued. Also appended to the memorandum are the affidavit of Heldt and certain correspondence between the Church and Service officials in which the Church asked the Service, and the Service refused, to defer the examination for 1968 and 1969 while examinations for earlier years were pending.

■■ The pendency of proposed assessments for the earlier years, however, does not in itself indicate bad faith on the part of the Service. Under § 501(c)(3) of the Code, determination of tax exempt status for a given year depends upon the financial operation of the Church for that year. *See Church of Scientology of Hawaii v. United States,* 9 Cir., 1973, 485 F.2d 313, 319 (Koelsch, J., dissenting). Moreover, the gross receipts of the California Church for 1968 and 1969 were markedly higher than those for 1964 through 1967. It was not unreasonable for the Service to investigate the different periods separately but simultaneously.

The Church also cites our *Church of Scientology of Hawaii* case, *supra,* and another case now pending on appeal to this court, *Handeland v. Commissioner,* 519 F.2d 327, as evidence of an alleged bad faith "harass and moot" strategy in which the Service repeatedly imposes assessments on churches of Scientology but stops short of litigating the merits of the churches' tax exempt status by refunding the taxes paid or conceding non-liability. In the Church of Hawaii case, we held that the taxpayer's suit for a refund was not mooted by the Service's tender of the taxes paid. *Handeland* involves an action in the Tax Court by ministers of the Church of Scientology of Minnesota in which the government admitted error and the Tax Court entered a judgment without opinion for the ministers. The propriety of this mooting tactic is not now before us. If this mooting tactic is improper, the Church will have its remedy, as it did in the *Church of Hawaii* case.

For present purposes, we conclude only that the Service's litigative strategy in

those cases does not sufficiently evince bad faith to require us or the district court to deny enforcement of the summons. It may be that the Service has capitulated in certain cases because small amounts were in issue or because it has insufficient evidence to sustain its case. We see no reason to bar it from gathering the evidence it deems necessary in this case. We note in passing that the Service has litigated to finality and won a case involving the tax exempt status of a Scientology church in *Founding Church of Scientology v. United States,* 1969, 412 F.2d 1197, 188 Ct.Cl. 490, *cert. denied,* 397 U.S. 1009, 90 S.Ct. 1237, 25 L.Ed.2d 422, where the court held that the Church failed to prove that no part of the corporation's net earnings inured to the benefit of private individuals. See 26 U.S.C. § 501(c)(3).

As evidence of purportedly improper Service motives, the Church also relies on a Service "Manual Supplement" dated September 2, 1970. Its stated purpose, as we observed in *Church of Scientology of Hawaii, supra,* 485 F.2d at 317, is to identify "Church of Scientology type religious organizations" and to provide guidelines for examining returns and processing applications. However, we see no reflection of a nefarious purpose on the face of this document.

The manual supplement is based on the opinion of the Court of Claims in *Founding Church of Scientology v. United States, supra.* The court discussed both the tenets and the structure of Scientology organizations. After pointing out that the Founding Church tithed 10 percent of its gross income to founder L. Ron Hubbard, the court observed, 412 F.2d at 1199:

> Other Scientology congregations, franchises, and organizations also paid Hubbard a portion of their gross income, usually 10 percent.

The Court of Claims explained, 412 F.2d at 1201:

> For purposes of deciding this case, we do not consider the income accruing to Hubbard from the affiliated congregations and organizations as

coming from plaintiff. However, under the circumstances here, the fact that Hubbard had income from such closely related sources indicates that Hubbard's compensation from plaintiff was not for full-time service. During the years in issue these other percentages, fees, and commissions, so far as the record shows, were apparently received or receivable by Hubbard for his personal use. Such an arrangement suggests a franchise network for private profit and, in turn, casts doubt upon the propriety of the payments by plaintiff to Hubbard and the members of his family. The fact that Hubbard was the recipient of income from plaintiff in the form of royalties and commissions likewise occasions an inference of personal gain.

Given the evidence in that case and the conclusions of the Court of Claims, it was entirely reasonable for the Service, using the characteristics sketched by that court, to identify Scientology organizations and to establish a uniform policy and procedure for examining them. In fact, we might suspect an improper external influence if, under the circumstances, the Service did not give such organizations careful scrutiny.

█ In short, we agree with the district court that the allegations of harassment and improper purposes were not supported by the record and standing alone did not require the court to deny enforcement. However, our inquiry does not end here, for it may be that the Church's allegations have more substance than meets the eye. *See, e. g., Center on Corporate Responsibility, Inc. v. Schultz,* D.D.C., 1973, 368 F.Supp. 863 (evidence of White House use of IRS administrative actions against certain "activist" organizations whose views were offensive to the White House).

B. *Denial of Discovery and Evidentiary Hearing.*

The Church contends that it was entitled to discovery under Fed.R.Civ.P. 30 and 34 or, failing that, an evidentiary hearing to inquire into the motives of the Service in issuing the summons.

Under Fed.R.Civ.P. 81(a)(3) the district court has considerable discretion to restrict or deny discovery. *See United States v. Bell,* 9 Cir., 1971, 448 F.2d 40, 42; *United States v. Ruggeiro,* 9 Cir., 1970, 425 F.2d 1069, 1071; *United States v. Ahmanson,* 9 Cir., 1969, 415 F.2d 785, 787. In contrast to the procedure in ordinary civil cases, discovery in a summary summons enforcement proceeding is the exception rather than the rule. The party resisting enforcement should be required to do more than *allege* an improper purpose before discovery is granted. *United States v. National State Bank,* 7 Cir., 1972, 454 F.2d 1249, 1252; *United States v. Salter,* 1 Cir., 1970, 432 F.2d 697, 700. Conclusory allegations carefully tailored to the language of *Powell, supra,* that the Service has issued a summons for an improper purpose such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, are easily made. *See Garrett v. United States,* 9 Cir., 1975, 511 F.2d 1037.

Allowing the Church to take depositions of the examining IRS agent and his superiors and to inspect internal IRS records and memoranda on the basis of such conclusory allegations would place undue burdens on the Service and impede what is supposed to be a summary enforcement procedure. Accordingly, we reject the Church's argument that it was entitled to pre-enforcement discovery.

Nonetheless, because, as we have seen, the Church or any other summonee bears the burden of proving bad faith harassment or other abuse, we think that the summonee must be afforded at least *some* opportunity to substantiate its allegations.

The Church argues that, failing to grant its request for discovery, the district court should at least have held an evidentiary hearing to inquire further into the motives of the Service in issuing the summons. As the Church points out, that was the approach adopted by the First Circuit in *United States v. Salter,* 1 Cir., 1970, 432 F.2d 697, where the summonee also alleged an improper Service purpose in issuing a summons. There the court said (at 700):

> We agree with the government, however, that respondent should be required to do more than *allege* an improper purpose before discovery is ordered in a proceeding of this type. Some *evidence* supporting respondent's allegations should be introduced. We approve of the following suggestion, offered by the government:
>
>> "The general solution would probably be for the district court to proceed directly to a hearing at which, if desired, the summonee could examine the agent who issued the summons, concerning his purpose. The court could then, by observation and, where necessary, its own questioning of the agent, makes its own determination of whether exploration, as by discovery, seemed to be in order."
>
> If, at the end of the hearing, there remains a substantial question in the court's mind regarding the validity of the government's purpose, it may then grant discovery.

The Third Circuit has recently adopted a similar procedure in *United States v. McCarthy,* 3 Cir., 1975, 514 F.2d 368. We agree with the First and Third Circuits that this solution would accommodate the needs of efficient tax administration and at the same time provide a reasonable opportunity for the summonee to carry the burden imposed by *Powell, supra,* of showing an abuse of the court's process.

In approving the procedure suggested by the First Circuit, we also endorse that court's limiting rationale that the purpose of the evidentiary hearing is to sift out those rare cases where bald allegations of harassment or improper purpose can be substantiated and thereby to avoid dilatory and burdensome discovery procedures. As the First Circuit said in *Salter, supra,* 432 F.2d at 700–01 (footnote omitted):

> We believe that there are strong reasons of public policy for placing a

burden of proof on respondent before allowing discovery in an enforcement proceeding of this type. A broad discovery order puts the Internal Revenue Service under a severe handicap in conducting a civil investigation. Broad discovery can be expected to cause extensive delays and to jeopardize the integrity and effectiveness of the entire investigation. Coupled with these considerations is the fact that taxpayers have been almost uniformly unsuccessful in proving an "improper purpose" defense. Requiring an evidentiary hearing will not preclude a respondent from raising and proving a [sic] "improper purpose," and we of course have no intention of precluding him from doing so. But we feel that the hearing requirement will have the salutary effect of eliminating discovery in cases in which it is clear that respondent will not be able to prove his allegations.

Applying these principles to the case at hand, we conclude that the Church's allegations of bad faith harassment by the Service, though thin, raised sufficient doubt about the Service's purposes to require the district court to hold a *limited* evidentiary hearing to determine whether further inquiry into the Service's purposes by way of discovery is warranted. Although we anticipate that such a hearing would entail, for example, cross-examination of the summoning agent (*Cf. Wild v. United States*, 9 Cir.,· 1966, 362 F.2d 206, 208–09), we do not attempt to define precisely the permissible scope of the evidentiary hearing. We leave that to the discretion of the district court.

In the proceedings below, the Church attempted discovery only by way of taking depositions and requests for IRS documents. Apparently counsel for the Church mistakenly believed that it had a right to discovery before the presentation of any evidence in the summons enforcement proceeding. Thus it is arguable that the Church waived any argument that it was entitled to a pre-discovery evidentiary hearing. However,

we agree with the Third Circuit, *McCarthy, supra,* 514 F.2d at 368 n. 11, that to hold under these circumstances that the Church failed to ask the court for the proper sequence of procedures would be unduly harsh. Moreover, in reviewing the record, we note that the Church twice called the district court's attention to the *Salter* case and the procedure there recommended. Accordingly, we conclude that the Church did not waive its right to an evidentiary hearing.

## IV. *Conclusion.*

In view of our conclusion that the district court should have granted the Church a limited evidentiary hearing to inquire into the Service's purposes, we do not reach the Church's other arguments for reversal.

Reversed and remanded for further proceedings.